## STATE v. MARTINEZ.

No. 3445.  Decided June 19, 1920.  (191 Pac. 214.)

1. HOMICIDE—EVIDENCE HELD INSUFFICIENT TO SUSTAIN CONVICTION FOR SECOND DEGREE MURDER. In a prosecution for murder committed while deceased was attempting to arrest defendant's son-in-law, where defense was that son-in-law, and not the defendant, fired the shot that killed deceased, evidence *held* insufficient to sustain conviction of murder in the second degree.

2. CRIMINAL LAW—PROSECUTING ATTORNEY'S ARGUMENT AS TO DEFENDANT COMMITTING GRAVE CRIME HELD NOT IMPROPER. In homicide prosecution, prosecuting attorney's argument to jury that defendant has "committed one of the gravest crimes ever committed in the state" *held* not improper; counsel having the right to state his conclusions from the evidence, though conclusions are wrong.

3. CRIMINAL LAW—EXCEPTION COMPLAINING OF REMARKS TO JURY NOT REVIEWABLE WITHOUT RECORD SHOWING REMARKS MADE. Exception complaining of remarks of counsel in argument to jury will not be considered where the record as to such assignment does not show what remarks were made.

4. CRIMINAL LAW—FAILURE TO TESTIFY DOES NOT CREATE PRESUMPTION OF GUILT. Under Comp. Laws 1917, section 9279, accused is not presumed to admit his guilt because of failure to testify.

5. CRIMINAL LAW—PROSECUTING ATTORNEY'S STATEMENT THAT DE-

FENDANT ADMITTED FIRING SHOT HELD REVERSIBLE ERROR. In
prosecution of Mexican for murder of American, where the evi-
dence was very close and very complicated, prosecuting attor-
ney's statement in argument to jury that defendant admitted
that he fired the shot that killed the deceased, and his reitera-
tion thereof on objection by defendant's counsel, where in fact
defendant had not admitted firing shot, *held* reversible error.

Appeal from District Court, Seventh District, Sanpete
County; *Geo. Christensen,* Judge.

Ignacio Martinez was convicted of murder in the second
degree, and he appeals.

REVERSED and REMANDED, with directions.

*King, Braffet & R. G. Schulder,* of Salt Lake City, for ap-
pellant.

*Dan B. Shields,* Atty. Gen., and *O. C. Dalby,* Asst. Atty.
Gen., for the State.

THURMAN, J.

The defendant, Ignacio Martinez, hereinafter called de-
fendant, was convicted of the crime of murder in the second
degree in the district court of Sanpete county, and sentenced
to a term of fifteen years in the state prison. From the judg-
ment so entered defendant appeals. The errors assigned,
as far as material, will be considered in the course of this
opinion. The victim of the homicide was one Rudolph
Melenthin, a forest ranger stationed at a point about ten
miles east of the town of Lasal, in San Juan county. The
alleged crime was committed in the county last named, and
by stipulation the case was transferred to Sanpete county
for trial. Previous to the trial of defendant one Ramon
Archuletta had pleaded guilty to the same offense and was
sentenced to imprisonment for life.

The principal question presented for our consideration and
upon which defendant relies with apparent confidence for

a reversal of the judgment is the sufficiency of the evidence to sustain the conviction. The testimony is voluminous. About twenty witnesses were examined and cross-examined at great length. It is necessary for this court to carefully examine all the evidence in order to arrive at a satisfactory conclusion.

The defendant and Archuletta are both Mexicans, the latter being the son-in-law of the former. It is conceded, however, that they never met or became acquainted with each other until about July 15, 1918. The homicide occurred on August 23 of the same year. As to whether or not the defendant was aware of the relationship of Archuletta at the time of the homicide the evidence is in conflict. It depends more or less upon circumstances. The defendant himself was not sworn as a witness. Archuletta testified that the defendant did not know of their relationship to each other until after they were arrested and brought to Salt Lake City. From circumstances, however, it might be inferred that the defendant was informed of the relationship between him and Archuletta when they first met about July 15, 1918.

Defendant was engaged in caring for sheep for a company in San Juan county, and was working under a man by the name of Robinson who had general charge of the sheep. Defendant appeared to be next to Robinson in point of authority concerning the sheep. The testimony shows that the defendant was a married man and had a family in New Mexico from whom he had been separated for about eight years. Correspondence, however, had been kept up between him and his family. He knew that one of his daughters had married during his absence and that her husband had joined the United States army but he had no personal acquaintance with him. This was the situation in the month of February, 1918.

One of the state's witnesses, a Mexican woman by the name of Rachel Alire, who resided at Lasal, was acquainted with the defendant, who also resided at the same place. Defendant frequently took his meals at her house, and there is a veiled suggestion, at least, in the brief of the Attorney General that the intimacy between the defendant and Mrs.

Alire was more than ordinary and perhaps transcended the bounds of propriety. On the other hand, the defendant's counsel contended that Mrs. Alire was not a friend of defendant, as indicated by the circumstances and by a contest instituted by her after defendant was sent to prison concerning a piece of land in which defendant claimed to have an interest. The charges and countercharges made by counsel for the respective parties concerning this relationship is of no special significance, as we view the case. It is sufficient to say that the defendant and Mrs. Alire appeared to be on neighborly terms at the time of the incident we are about to relate, and had been so for some time previous. She had written letters for him at his dictation and requests and had read to him letters received from others. Mrs. Alire testified that in February, 1918, the defendant received a letter postmarked Ignacio, Colo., and requested her to read it. The letter was not produced at the trial, but the substance of its contents, according to her recollection, is as follows:

"My Much Beloved father: You possibly know that I am fleeing or escaping. I am a deserter from the army. I am in this place— at this place of Ignacio. I would like to know if I could stay with wou there, if you will give me work—to me and my companion. I would like to know if you would help me with some money, that I might go where you are and stay there if possible. You will direct my mail in the name of Ignacio Alguin. I am your son-in-law, Ramon Archuletta. I am married to your daughter. Don't forget to direct my mail Ignacio Alguin at Ignacio, Colorado." Signed by Ignacio Alguin.

To this letter the defendant dictated the following reply, which was addressed and mailed as directed in the letter above quoted:

"To Ramon, my Beloved Son: I am sorry that you are as you are. I am ready to help you if you will not bring something against me. I can help you that you might come here, but it would be better for you if you would go back again to the army, or if you will come here I will see how I can relieve you or hide you. I will send you money to help you and tell me who is your companion. I have work for you."

Nothing further is heard from any one connected with the case for a period of about five months. On or about July 15 the person now known as Archuletta called at the home-

of Mrs. Alire in Lasal. She was outside of her house. Archuletta inquired if she knew of the whereabouts of the defendant, calling him by name, Ignacio Martinez. She informed him that defendant was in the house, and she thereupon called defendant out. The undisputed evidence shows that this was the first time Archuletta and the defendant had ever met. According to the testimony of Mrs. Alire they spoke in low tones so that she did not hear what was said. From there the two men went to defendant's home, about 200 yards distant. Later they returned to the home of Mrs. Alire who served them supper. In conversation with Archuletta at that time he informed Mrs. Alire that his name was Pantaleon Lagunas, and that he was from Old Mexico. Archuletta went to work for defendant clearing a piece of land, and until the date of the homicide was known among his associates as Pantaleon Lagunas. To avoid confusion, we shall, however, refer to him as Archuletta, which undoubtedly was his true name.

At this point it is convenient to submit some facts respecting Archuletta which are not in dispute. He was a resident of New Mexico. He gave his age as twenty-three or twenty-four at the time of the trial. On or about September, 1917, he joined the United States army, and later was stationed at Kansas City, Mo. From this point he deserted from the army and returned to New Mexico, where he was captured. This was in the late fall of 1917. He shortly afterwards escaped and went to the Navajo reservation, where he worked herding sheep. According to his own testimony, which is not in dispute, he was on the reservation at one place or another until May, 1918. From there he went to Pagosa Springs, Colo. This he states was about the 1st of June. He worked there several days, and then came to Utah, arriving at Lasal, as before stated, about July 15.

As we have seen, Archuletta was employed by the defendant clearing land near Lasal. He continued in this employment until about August 11, when he was employed by defendant to herd sheep. This was done at the suggestion of Mr. Robinson, who authorized the defendant to employ a herder. In payment or part payment for work done for de-

fendant he gave Archuletta a revolver, afterwards referred to in the case. On the first day Archuletta started to herd sheep he and defendant met Frank Barnes, sheriff of San Juan county, and Rudolph E. Melenthin, for the alleged killing of whom defendant was afterwards convicted. Defendant and Archuletta were traveling in a wagon. Barnes and Melenthin were on horseback. Barnes informed the defendant that he had a telegram from the adjutant general of New Mexico authorizing the arrest of Ramon Archuletta as a deserter from the United States army. Defendant acted as interpreter between Barnes and Archuletta. Barnes testified that the defendant told him the boy was from Old Mexico, was not Ramon Archuletta, but Pantaleon Lagunas; that Melenthin and defendant engaged in some conversation which he could not hear, after which Melenthin said: "I guess everything is all right. This can't be the man." Barnes took from Archuletta the revolver heretofore mentioned, saying that aliens had no right to carry arms. After advising defendant as to the consequences of aiding a deserter and informing him that Archuletta would have to register, and learning that Archuletta was going to work for Robinson at the sheep camp, Barnes and Melenthin rode away. Before leaving, however, they asked defendant what he had in his wagon. Among other things, the defendant had a gun. He told them they could take that if they wanted to. Melenthin promised Barnes to look out for the case and if anything developed to call him by telephone. They then separated. This is the last we see or hear of Melenthin until August 22, the day before the homicide.

Before considering the event of the 22d, there are a few circumstances which should be detailed which it is contended have a material bearing upon the state's theory of the case. Mrs. Alire testified that she saw defendant at her home after the Barnes and Melenthin affair to which we have referred, and that he seemed very angry because some one was betraying this man (meaning Archuletta). She also testified that defendant said some dog of a Mexican was betraying him. Asked as to defendant's conduct on that occasion, witness said she "couldn't say anything as to his conduct at that

time." Later on he told her that he liked the man and was "going to protect him in every possible way." She also testified that at that time she gave him at his request fifteen 30-30 cartridges for his gun; that defendant kept the gun in his hand all the time when he was there; that before that he always left his gun.

Another circumstance relied on by the state relates to an exchange of guns between the defendant and a Mr. Franklin who was in the neighborhood on a short vacation, and who had some acquaintance with defendant. Defendant came to the Franklin camp, and the two men shook hands. Franklin said: "We want some meat. Robinson says we can have some meat." Defendant said: "All right I go. I have no gun. My gun no good." He had a gun with him which worked loosely and did not eject the cartridges. Defendant said: "I take your gun. I want some cartridges. I have no cartridges." This was on the 14th of August. Franklin took defendant's gun and stood it in the cabin and handed defendant his own gun, which was loaded with eight cartridges. It was a 30-30 Winchester. Defendant killed a mutton for Franklin, and a few days later killed another, using one cartridge on each occasion.

The foregoing incidents illustrating the demeanor, conduct, and feelings of the defendant prior to the tragedy which occurred on the 23d day of August are the main ones relied on by the state, together with the circumstances connected with the tragedy itself, in support of its contention that the defendant was the actual slayer of Melenthin.

On the 22d day of August, the day before the homicide, Melenthin called sheriff Barnes by telephone and informed him he had received further information concerning the deserter and guessed that they had made a mistake in releasing Archuletta. Barnes authorized Melenthin to arrest Archuletta and obtain such assistance as might be necessary. On the next morning Melenthin and a forest guard named James Moore proceeded to the camp of one Lopez, at which place they took lunch about 11 or 11:40 a. m. At this place they procured a Mexican by the name of Vejil, who was acquainted with Archuletta. They took Vejil along to make the identifi-

cation, and arrived at defendant's camp after 1 o'clock p. m. On approaching the camp they saw defendant, Archuletta, and a Mexican named Francisco Mesta, some distance from the camp. Defendant and Francisco had horses saddled and guns on their saddles. Archuletta was on foot. Seeing the approach of Melenthin and party, they came to the camp, Archuletta first. Archuletta immediately entered the north tent and seated himself upon a bunk in the northeast corner of the tent. There was another bunk in the southwest corner upon which Melenthin, Vejil, and defendant took their seats. Francisco went into the south tent. These two tents were placed substantially east and west, about 20 feet apart. A saddle rack consisting of a pole fastened at each end to a post extended from a point about 3 feet south of the southeast corner of the north tent in a southeasterly direction to a point nearly in front of the northeast corner of the south tent. A plat or diagram of the premises reproduced by the Attorney General from an exhibit used at the trial is here inserted. As far as we are able to determine, it is a substantial reproduction of the original. It illustrates the situation of the premises and the various objects referred to in the evidence as testified to by the witness Moore.

The diagram, as far as practicable, is self-explanatory. Additional explanation, if necessary, will be made as we proceed.

James Moore, who accompanied Melenthin to the scene of the tragedy, was the only witness called by the state who testified as to what transpired at the camp at and prior to the actual conflict which resulted in the death of Melenthin.

As before stated, Archuletta was the first to enter the north tent. Melenthin, Vejil, and the defendant followed. Melenthin said, "I have come to take that man." Defendant acted as 'interpreter. Archuletta said, "All right." The parties became seated on the bunks as before stated. Moore remained on the outside. Shortly thereafter Melenthin and Vejil came out of the tent. Melenthin took an affidavit from his pocket, handed it and a fountain pen to Vejil, and told him to sign the paper, which he did. Melenthin said, "This is the man we are after." There was some conversation between Melenthin and defendant about a horse and saddle. Melenthin asked defendant if he could take a horse. Defendant said he could take his grey horse, but that he needed his saddle himself. Defendant then went to the south tent and spoke to Francisco, who got on his horse and rode north. He was gone about one hour and a quarter. He came back with a saddle and laid it down in front of the north tent. Defendant had told Melenthin he thought he could get a saddle up at some cabin. Francisco went and came back with a saddle. While Francisco was away defendant made some inquiry of Melenthin about a spring for his gun. Melenthin told him it was over at the station. Defendant said, "I wish I had it in my gun now." Melenthin told the defendant to bring his gun over and he would fix it. Defendant took a paper out of a box he was sitting on and handed it to Melenthin, who tossed it to one side. Defendant said, "This war is all damned lies." The witness Moore at this point described the position of the parties and identified the exhibit from which the above diagram was copied. The square in the northeast corner of the tent represents where Archuletta sat. The flaps of the tent were thrown back,

and the tent was open. It fronted towards the east. The drawing in the southeast corner of the tent represents another bunk. The little square near the front represents a stove. The semicircular dotted line in front of the north tent represents a yard. The letter A on the bunk in the northeast corner of the tent represents where Archuletta sat while Francisco went for the saddle. He had his gun on the bunk behind him. Witness asked Archuletta if he had a gun. He took it up, jolted it down twice, and said nothing. He then laid it behind him. During this time Melenthin was seated at point M near the southeast corner of the north tent outside. Witness sat at point J near Melenthin. Defendant sat at point D nearly east of Melenthin. Vejil stood up at point V, leaning against the saddle rack. The saddle rack was strung with pack saddles. During the greater part of the time Melenthin sat watching Archuletta. Witness said to Melenthin, "Let's do something." Melenthin said, "Don't get excited." When asked the reason for saying that, witness said he saw Archuletta was mad; that he was biting his finger nails off. Defendant's demeanor was calm. He never said anything. The point marked S in front of the tent indicates where Francisco dropped the saddle on his return. After taking the saddle off Francisco went south out of sight. The point marked F indicates where defendant's horse was tied to a tree. After Francisco went south defendant got up and started to unsaddle his horse. He first pulled his Winchester out of the scabbard and laid it on the ground north of the horse. Point D-2 represents where the defendant laid his gun after taking it from the scabbard. Defendant then took the saddle off the horse, shook the blankets, put the saddle on again, and cinched it tight. Melenthin said, "Ain't you going to let me take that horse?" Defendant said, "I will let no G——d d——n white man take my horse." Melenthin then told witness to get on his horse. The position of his horse is shown by point M-H, south of the saddle rack. Defendant then came around and picked up his gun with both hands. Archuletta then walked rapidly out of the tent to the point marked A-2, just in

front of the tent, with his gun in his hand. His course is marked by a dotted straight line. When Archuletta started off the bunk Melenthin jumped up at point M and motioned his hand and told him three times to lay down his gun. Archuletta made no response. Melenthin had his gun, a 38 six-shooter, "drawn right on Archuletta." Melenthin drew his gun as he rose up. He approached Archuletta in that position. Melenthin told witness to run. Witness was on his horse and ran. Witness saw Vejil run from where he was leaning against the pole. Vejil ran south, indicated by the dotted line. He ducked under the pole and ran out of witness' sight. Witness ran out between the two tents indicated by the arrows. As witness started off he heard a shot, looked back, and saw Melenthin stagger. Melenthin and Archuletta were facing each other. Witness saw Archuletta's gun over Melenthin's right shoulder. Witness ran in a southwesterly direction. When he last saw Archuletta, before starting to run, he was standing with his gun in an upper position, and Melenthin had him covered with his six-shooter. They were facing each other about four and a half feet apart. Witness here undertook to illustrate the exact position of Melenthin and Archuletta, and the manner in which they held their guns. The record, however, is incomprehensible to one who did not witness the illustration. Witness from there went to Lopez's camp, where he had taken his lunch at noon. Vejil had arrived there just before.

Such is the substance of the examination in chief of James Moore, the state's principal witness, as far as the actual tragedy is concerned. We have endeavored to state in substance every feature of the testimony, especially such features as tend to support the conviction.

The physician who made the post mortem examination of Melenthin's body described the wounds, in substance, as follows: No. 1 entered the body six and a half inches from the center of the spine on a line with the right nipple and six and a half inches from it. It was ten inches from the top of the shoulder on the right side. It came out two and a half inches below the left nipple. No. 2 entered eight inches from the

center of the breast bone on the right side three inches below the level of the right nipple. Its exit was two and a half inches from the center of the neck, about six inches above the left nipple. There was another wound in the right thigh which is not deemed material.

It appears from the testimony that before the last shots were fired defendant got on his horse and left the camp, passing Francisco, who was hobbling his horse some distance below the camp. He said to Francisco, ''These men have killed each other.'' From there he went to Robinson's camp. He arrived at the camp on a fast trot about four o'clock. His usual habit was to ride slowly. He got off his horse and went into the house; then went out and talked to the boys. Mrs. Robinson, a witness for the defendant, says she heard defendant say some one was shot. She asked him what the trouble was. He said, ''One of the herders and Mr. Melenthin had shot one another.'' He said he needed help. Witness sent the boys for the horses, and they went to the camp. Witness said defendant told her Melenthin was not dead when he left the camp. When they arrived at the camp Mr. Franklin was there. He informed them Melenthin was dead. Melenthin's body was behind the north tent, as shown on the diagram. Witness asked Franklin to cover the body, which was done. The body lay on its face, the face turned up a little, and the left hand stretched out. There was no scabbard, pistol, or belt on the body. Witness was informed that Archuletta was about fifty feet from the tent, in the brush. She observed one rifle shell a little in front of the north tent. There was a cleared spot in front of the tent. Witness did not pick up the shell. She saw some blood where she saw the shell. Reference at this point to testimony of witnesses for defendant is limited solely to such testimony as is not in conflict with evidence offered by the state.

Mr. Franklin, a witness for the state, testified to the exchange of guns between him and the defendant and the subsequent killing of the two sheep, as heretofore stated. At the scene of the homicide on the afternoon of the twenty-third witness found Melenthin and Archuletta. Melenthin was lying

west of the north tent on his stomach, face slightly turned up-
ward, breathing his last. His toes were stuck in the ground,
his spurs sticking up. His head lay close to a rock. His
hat was on his head. His shirt at the back was protruding
from his pants. Witness saw some blood near the corner of
the tent, sprinkled on the leaves. Archuletta was about fifty
feet north of northwest of the tent. The ground at Melen-
thin's feet was a little bit ruffled up next to his toes, and it
looked like he had been digging with his heel. His tobacco
can and pencil were in the left-hand jumper pocket. There
was no six-shooter or scabbard on his body.

On the twenty-fourth, the day after the shooting, when the
defendant was under arrest for the killing, witness Franklin
asked him why they had arrested him. Defendant said ''Sh-h;
they hear.'' There were twenty or twenty-five men around.
They were more or less excited. Defendant made no further
reply. The gun witness had exchanged with the defendant
was returned by the sheriff on the twenty-fourth. There were
six cartridges in the gun. The witness also testified to seeing
Archuletta in the brush on the twenty-third, and that he had
a pistol, scabbard and a long gun. Witness recognized the
pistol as Melenthin's. Archuletta was wounded also. ''His
left hand was all shot up.'' He was also shot above the knee,
through the leg. Witness was at the camp when defendant
and the Robinson family arrived on the twenty-third. There
were two holes through the back of the tent about nine inches
apart. The holes were under the bunk. The body of Melen-
thin lay by the side of the bunk, but outside of the tent. Wit-
ness covered the body with a tarpaulin; the defendant assist-
ing him. The ground in front of the north tent was as ''clean
as this floor.'' When witness lifted Melenthin's body, there
were four cartridge shells from a revolver and one live one,
also a pool of blood. The cartridges were No. 38.

Mrs. Alire testified for the state, and, in substance, said:
Defendant was brought to her house on the twenty-fourth or
twenty-fifth of August. He was a prisoner. He asked for a
change of clothing. He changed his shirt and told witness to
burn the shirt he had taken off. She asked defendant what

he had done. He said, ''If he (meaning Archuletta) said he done all himself, I am going free again.''

We have now detailed at considerable length the principal points and circumstances relied on by the state in support of its theory that the defendant, and he alone, fired the shots that killed Melenthin. That is the theory adopted by the Attorney General and promulgated in his brief for our consideration.

We will now briefly consider the testimony for the defendant. There are a few points of greater or less materialty that tend to reflect additional light on the situation. We have already referred to the fact that Francisco, testifying for the defendant, stated that defendant passed him leaving the camp before the shooting ended, making the remark that these men had killed, or were killing, one another, and at the same time told Francisco to look after the fold. Francisco also testified to certain things not testified to by the witness Moore because Moore could not understand the Spanish language. He testified that he and defendant were preparing to go to see some traps when Melenthin, Moore, and Vejil came to the camp; that after they had been there awhile defendant asked him to go to Franklin's camp and get a saddle; that he understood it was the saddle of Archuletta; that he went on his horse for the saddle, returned with it, and put it in front of the north tent; that when he returned with the saddle defendant requested him to go and get a horse belonging to witness, called ''Baldy.'' Witness got on his horse and went in a southeasterly direction and found the horse. The horse and saddle were to take Archuletta away. Witness caught the horse, was returning to the camp, and when about sixty yards away he heard the first shots. He saw Archuletta ''sort of lying down on the ground, but raised himself on his elbows,'' holding his gun in the attitude of shooting. It was after that that defendant passed him where he was hobbling his horse. Point F on the diagram indicates the direction Francisco was when he heard the first shots. Defendant passed him about three minutes after-

wards.    Fifteen  or  twenty  minutes  after  that  Francisco
heard the last two shots.

Vejil also testified for defendant.   He testified to going
with Melenthin to identify Archuletta.   The distance was
about five miles.    Arrived  at  defendant's· camp  about  two
o'clock.   Defendant and Francisco were there, about thirty
feet from the tent.  When he arrived Archuletta was in the
tent.   Witness and Melenthin shook hands with defendant
and Francisco.   Witness sat on the bunk by Archuletta.
Melenthin sat on the west bunk.  Melenthin told defendant
to come on.   Defendant came in and sat down next to Melen-
thin.   Melenthin told defendant he had come for this man.
Defendant interpreted it, and Archuletta said, "All right."
When witness came in the tent, he addressed Archuletta, call-
ing him by name.   Defendant then went out of the tent and
told Francisco to "go to the little house and bring the sad-
dle of this man."   Francisco went in the direction of his tent.
Witness and Melenthin went out and witness signed the
paper.   Melenthin returned to the door of the tent and asked
Archuletta who the rifle belonged to.   Archuletta said it was
his.   Melenthin asked Archuletta if the boss had any of his
money.   Archuletta said he had a little.   Melenthin then
went and sat two or three yards from the southeast corner
of the north tent.   Witness sat down near Melenthin.  Defend-
ant was sitting two or three yards from Melenthin (direction
not intelligible).   Archuletta was in the tent.   Moore was at
the end of the saddle rack.   His horse was in front of the south
tent.   They all sat there until Francisco returned with the
saddle.   While they were sitting· there, Archuletta said from
where he was sitting, "On account of tattlers—babblers—
they have caught me."   Then Archuletta asked about the
pistol they had taken away from him.   Melenthin said it
was at Lasal.   Defendant then asked Melenthin how much
he wanted for the pistol.   Melenthin said twenty-two dollars.
Defendant went to his bed in front of the tent about seven
yards away and got some money.   Archuletta asked what
he was going to do.   Defendant said he was going to pay
Melenthin twenty-two dollars to return the pistol.   Melen-

thin asked defendant if it was his gun. He said yes it belonged to him. He said he sold it to Archuletta in lieu of pay for work Archuletta had done for him. Melenthin did not want to take the money and defendant put it in his pocket. Francisco returned with the saddle and threw it down in front of the tent. Then defendant sent him after the horse. Melenthin had told defendant he wanted a horse so he could take Archuletta to Lasal. Defendant said he could take his horse he had there. Defendant then started to take off his saddle. Francisco went away when defendant sent him for the horse. While defendant was taking the saddle off his horse, Archuletta said to defendant, from inside the tent, "I will sell you my horse, Mr. Ignacio." Defendant said, "I will not buy it from you; Robinson will buy it from you." Defendant had told Francisco the horse he sent for was over there by the pine tree. Francisco left to get the horse. Defendant started to put the saddle on the horse again. He put it on. There was a gun in the scabbard on defendant's saddle. Defendant took the gun out of the scabbard and set it against a tree. After he put the saddle on he put the gun back in the scabbard. Defendant then went to a point in front of the corner of the north tent—a little northeast. The point is indicated on the diagram as circle D-4. Melenthin was still sitting at the place before indicated. Moore was on his horse in front of the saddle rack. Witness saw Archuletta in the tent bend over and get his rifle. Witness touched Melenthin's foot. Archuletta came out of the tent carrying his gun in his left hand and went straight from the door of the tent, indicated by the dotted line leading from the tent to A-2. He had the gun in his left hand with the barrel pointed down and the stock slightly back of his elbow. He walked about five yards. Defendant was still at the point indicated by circle D-4. Melenthin got up and told Archuletta to give the gun to defendant. Melenthin walked towards Archuletta. He had his revolver in his belt. Melenthin took the gun out when Archuletta fired the first shot. Witness ran away. Moore ran before witness did. Witness called to Moore to wait for him. Moore turned

his horse around when Archuletta fired the first shot. Before witness ran Archuletta shot twice. Melenthin shot once. Witness heard many shots while running. Defendant was still standing at the same place when witness left. Witness did not see defendant have a gun at that time. If he had one, witness thought he would have seen it. He did not see defendant after that. He saw Francisco coming with the horse before the shooting started about 300 yards distant. Witness went to his own camp, running all the way. Moore was there a little before witness. He thought there were about eight shots fired. He didn't hear defendant say he would "let no G—d d—n white man have his horse." On cross-examination witness said the conversation at the camp sometimes was in English, which he did not understand. He testified that Melenthin drew his revolver quickly. Later on, on cross-examination, his attention was called to the fact that on the preliminary examination he testified that Melenthin at first had some difficulty in getting his pistol out of the scabbard. He admitted saying that, and said it was correct; that Melenthin could not get his pistol out until Archuletta fired the second shot. After running to his camp, witness said Moore asked him where Melenthin was, and witness answered, "I don't know; possibly they have killed him." Witness also stated that Archuletta handled his gun with his left hand. With the right hand he held the gun and with the left he pulled the trigger. Both men were on their feet when witness last saw them, but Melenthin twisted to the right.

Archuletta, a witness for defendant, testified concerning his former life, the substance of which we have already related. He denied writing to defendant, as testified to by Mrs. Alire. Stated that he never wrote him any letter; that about the 27th of June, 1918, he saw some men while coming to Utah who had a letter of recommendation to Ignacio Martinez (defendant). They said they were not thinking of coming to Utah any more, and asked witness if he wanted the letter. Witness said "Yes." The letter was addressed to Ignacio Martinez, Lasal, Utah. Witness took the letter

and came to Lasal and inquired for defendant. He asked an American before he arrived at Lasal. He inquired of Mrs. Alire and defendant came out of her house. That was the first time witness had seen him. Witness asked defendant his name, and on being answered told him he had a letter of recommendation. Witness gave defendant his name as Pantaleon Lagunas, and told him he was from Old Mexico and gave him the letter. Witness asked defendant for work. Defendant said he had no work, but would try to get work at another place. Defendant finally gave the witness work clearing a ranch at fifty dollars a month and board. Witness started to work with the sheep August 10 or 11. He received from defendant a revolver as part payment, the price being twenty-two dollars. He related the incident in which the sheriff and Melenthin figured wherein he was suspected of being a deserter. The pistol referred to was taken from him on that occasion, as testified to by Sheriff Barnes. Witness never told defendant that his name was Ramon Archuletta prior to August 23. He also identified the rifle in question; said it was furnished him by Mr. Robinson. It was on the bunk closest to the door. He said Melenthin's party got off their horses, spoke to defendant, and came into the tent. Witness was seated on the bunk. Defendant told witness Melenthin had come for him, and witness said, "All right." Melenthin asked Vejil if that was the man, and Vejil said "Yes." They went outside. Melenthin told witness if he was Pantaleon Lagunas or Ramon Archuletta he was going to take him. Melenthin and the others sat down outside. Vejil signed the paper. Melenthin and the defendant sat close together. Vejil stood up at the saddle rack. Jim Moore stood up about five feet from the others in front. Francisco was in his tent. Defendant told Francisco to get witness' saddle. It was at Franklin's camp. Francisco went away on horseback and returned in about an hour and a half with the saddle. He placed it in front of the north tent. Witness related the incident of the revolver, and the offer of defendant to pay Melenthin for it. Witness objected and told them to pay him. The money was not given to witness.

After Francisco returned with the saddle defendant asked him to lend him the Baldy horse so they could take witness to Lasal. Francisco said all right and went after it. Witness told defendant he would sell him his horse, and defendant said he would not buy it, but that possibly Robinson would. Witness saw defendant go to his horse and take the saddle off. He had a gun on his saddle. He took off the gun and put it against a quaking asp. Defendant then put the saddle on again. Witness could not tell why. Defendant then put the gun back in the scabbard. He then returned and sat down by Melenthin. Witness was still in the tent. Defendant told witness Melenthin said the horse was coming, and that witness should fix his saddle and get it ready. Witness went out of the tent with his rifle in his left hand with the muzzle of the gun slightly up in front of him and the stock of the gun down near the side of his leg. Defendant was then on the north side of the tent indicated by D-4 about five feet from the northeast corner of the tent. Witness walked straight out in front towards his saddle. He at that time heard Melenthin speak to him, but did not understand. Melenthin made signs with his right hand. He was then standing up. He took out his pistol. He made one or two steps toward witness. After pulling out his pistol his right arm was extended from his shoulder straight (witness illustrates; not intelligible). Witness turned around, Melenthin shot. The shot entered witness' left hand, in which he held his gun. Witness' gun was still by his side. Witness then shot with his right hand (illustrating; not intelligible). Witness shot as quick as he could. Before shooting however Melenthin shot again, striking witness in the leg, breaking it. Witness fell forward on his face and shot at Melenthin again from that position. Witness shot about three times in front of the tent. After witness shot, Melenthin made a move (illustration not intelligible). Witness said: "He went this way, abruptly throwing himself to his left side." He did that when witness fired the first shot. After witness was shot and was on the ground Melenthin went along the south side of the tent. After he moved out

of witness' sight witness heard another shot from the north
tent. Witness was still in front and shot two more shots
through the tent. He could not see Melenthin. During the
shooting, defendant was still near the northeast corner of
the north tent (circle D-4). He had no gun. Nobody but
witness fired at Melenthin. Witness saw defendant pass
behind him in the direction of his horse, which was out in
front of the tent where he had taken the saddle off. His
horse was a little south of a line extended from the south
side of the tent probably four steps. Witness had not fired
through the tent when defendant went away. Defendant
got on his horse and went in the direction Francisco went
for the horse. Witness later saw defendant pass in a north-
erly direction. That was after witness fired through the tent.
After the last shots, in about ten minutes, witness went
around the tent on the north side. Melenthin had fallen be-
hind the tent, face downward. His revolver was close to his
hand. Witness took off the cartridge belt and put it on him-
self, scabbard and all. He took the shells out of the revolver
and reloaded it. There were five empty shells—one not dis-
charged. It was knicked or misfired. Witness said when he
went out of his tent to his saddle he did not expect any shoot-
ing to occur. He would not have fired at Melenthin if Mel-
enthin had not fired first at him. When witness fired he
believed his life was in danger and that he was in danger
of great bodily harm. Witness fired for the purpose of sav-
ing his own life. The first time witness ever told defendant
he was his son-in-law was after they were taken to the pen-
itentiary. He never advised defendant that he was a de-
serter. There never was any agreement or arrangement be-
tween witness and defendant that defendant would prevent
his arrest.

Mrs. Minnie Franklin, testifying for defendant, said she
knew of defendant's getting her husband's gun and getting
mutton for them; remembered Francisco's coming on the
twenty-third for a saddle and taking it away. He came on
horseback. Witness and her husband were then preparing to
leave the mountains the following morning. Her husband

went to defendant's camp to get his gun. He returned and in-
formed her of the shooting. She went with him to defend-
ant's camp. Witness stated that on the night of the homicide
James Moore came to their tent. He inquired where Melenthin
was and asked who shot him. Her husband answered:
"Pantaleon Lagunas." Moore said: "No; Albina shot
him."

Bronson, a witness for defendant, testified that he was ac-
quainted with James Moore; that on the day of the trouble
he saw Moore at his sawmill; that Moore appeared to be ex-
cited and said Melenthin was dead. He said Albina had
come up behind him and "cut loose." He said when he last
saw the defendant he was standing by his horse, and that his
gun was partly in the scabbard. Witness, on cross-examina-
tion, said that Moore stated when he last saw defendant he
had his gun in his hand.

W. E. Robinson, a witness for defendant, testified that de-
fendant was in his employment. Witness was manager of
the Indian Creek Cattle Company. On the tenth day of Au-
gust, 1918, witness authorized defendant to employ a sheep-
herder. On the morning of the twelfth defendant informed
him he had employed one. On the sixteenth, he went to the
herd and saw the man defendant had employed. The man
was called Pantaleon Lagunas. Witness recorded him by that
name. Defendant and Francisco were also at the herd.
Lagunas asked for a gun. Witness told him he did not have
to buy the gun; that the gun belonged to the camp, but that
he would have to buy his own cartridges; that if he lost the
gun, or broke it, or traded it off, it would cost him twelve dol-
lars. There was a box of cartridges for the gun which witness
delivered to him and charged them to his account. The com-
pany furnished guns to their employés to kills animals, but
they were required to pay for their cartridges. The com-
pany gave them a bounty for each animal killed. That is
the way they pay for their cartridges. That was the first
time witness had seen the man. On the twenty-third of Au-
gust witness met Melenthin and James Moore. Melenthin
asked witness if that fellow (meaning Archuletta) was still

working with Ignacio (defendant). Witness told him he was. Melenthin said he had information that he was a deserter, and that he was going after him, and wanted to know who was at the camp. Witness told him that Ignacio and Francisco were there, and that the man had a 25-35 gun and a box of cartridges. Melenthin referred to the man as Ramon Archuletta, and said if he was the man he would bring him back with him. That was the first time witness had heard that name or had heard anything about it. Melenthin asked if defendant was at the camp; if so, he could do the talking for him. Witness told him the man had a horse and saddle of his own, and that, if he did not find the horse, he could have any horse that was there; that there were plenty of horses. Witness told Melenthin to tell defendant to get him a horse. Witness then testified to telling Franklin he could have some meat; that he could get it at defendant's camp; that the cartridges referred to for the 25-35 gun were soft point bullets.

We have now stated at considerable length the history of this lamentable affair. The evidence in some respects is fragmentary and disconnected, but the writer has attempted to detail every material feature of the transaction with scrupulous regard for accuracy and truth.

The question is: Is the evidence sufficient to support a judgment of conviction? The Attorney General on behalf of the state has supplied us with an able and comprehensive brief, and, notwithstanding his conclusions drawn from the evidence may be at variance with our own, it must be admitted that no point in the least degree favorable to the state or unfavorable to the defendant has been overlooked. The most possible that could be made out of every circumstance detailed in the evidence has been made and presented for our consideration with consummate ability.

Waiving preliminaries for the present and coming at once to the scene of the fatal encounter, the state contends that it was impossible that the fatal wounds could have been inflicted by shots from the gun of Archuletta; that they must have been inflicted by the defendant, and by him alone. As

to what occurred at the time of the shooting, the state relies
almost entirely upon the testimony of James Moore, its only
witness. In the light of the testimony of Moore and the lo-
cation of the wounds as described by the post mortem physi-
cians it is contended that the wounds were in such position
on the body as to preclude the possibility of their being made
by Archuletta; that they must have been made by defend-
ant, who stood almost at right angles from Melenthin and on
the side from which the shots must have been fired. It is
unquestionablly the strongest circumstance in favor of the
state's contention to be found in the entire record of the
case, and if it is so connected as to constitute an unbroken
chain, it should be well-nigh conclusive of the question we
are endeavoring to determine. Moore places defendant just
before the shooting began at circle D-3, a little to the rear
of a line drawn at right angles from where Melenthin stood.
Without referring in detail to the evidence, it is admitted
that, if Melenthin, who stood at circle M-2, was facing Ar-
chuletta, who stood at circle A-2, the shots which inflicted
the fatal wounds could have been fired by one standing in
the position of defendant, but could not have been fired by
Archuletta. At this point let us briefly consider the testi-
mony of Moore. Moore says when Archuletta started off the
bunk Melenthin jumped up at point M and told him three
times to lay down his gun; that Archuletta made no response.
Melenthin had his gun, a 38-caliber six shooter, drawn right
on Archuletta. Melenthin drew his gun as he rose. He ap-
proached Archuletta in that position. Melenthin then told
witness to run. Witness was on his horse and ran. As wit-
ness started off he heard a shot, looked back, and saw Melen-
thin stagger. Melenthin and Archuletta were facing each
other. Witness saw Archuletta's gun over Melenthin's
shoulder. No witness at any time saw defendant holding
his gun in a menacing attitude; no witness heard him threat-
en to shoot or heard him say anything indicative of an in-
tention to shoot. It is true, according to Moore's testimony,
after defendant had resaddled his horse, he picked up his
gun from the place where he had laid it. He picked it up

with both hands, and thereafter held it with both hands but it is evident it was not held in a manacing manner, or Moore would certainly have testified to a fact of such grave significance. In these circumstances what right has this court, or even a jury, to assume that defendant fired the shots that killed Melenthin? Moore did not see, nor could he see, the position Melenthin was in when the fatal shots were fired. When he last saw Melenthin before the shooting Melenthin was facing Archuletta; when he next saw him a few seconds later, he was staggering, evidently from the effects of a shot. Just what position he was in when that shot was fired is a missing link in the chain of evidence as far as Moore's testimony is concerned. We cannot indulge in speculation or conjecture; the jury had no right to do so. It will not do to presume that defendant fired the fatal shot just because when last seen he was in a position from which the shot might have come. Especially is this true in the absence of positive evidence as to what position Melenthin's body was in when the shot was fired. This court is bound to give full force and effect to every material fact as to which there is any evidence in the case, but it is not bound to give effect to assumptions and conclusions not based upon established facts. There is, however, other testimony positive and direct as to who fired the shots that killed Melenthin. The testimony covers the period during which the witness Moore did not see and could not tell just what the attitude of the parties was or who did the shooting. The witness Vejil went with Melenthin to identify Archuletta. He was there when the shooting began. He says Archuletta fired the first and second shots before Melenthin shot at all. He says Melenthin had trouble getting his gun out of the scabbard, which, if true, accounts for Melenthin's delay in shooting. Vejil says that when the second shot was fired by Archuletta Melenthin "twisted to the right." He also says that while these shots were being fired by Archuletta defendant was at circle D-4 near the northeast corner of the north tent. He saw no gun, and thinks if defendant had had a gun he would have seen it. Archuletta testified that he alone did the shooting, that

defendant did not shoot at all, and places him at circle D-4 while the shooting was going on. The testimony of Archuletta is diametrically opposed to that of Vejil as to who fired the first shots. He says they were fired by Melenthin, wounding him in the hand and knee, and that thereupon he fired in self-defense. It is not our intention to undertake the difficult role of trying to determine which of these stories is correct. It is not our province to do so. Where the evidence is in conflict, it is a question for the jury to determine. In so far as the testimony is not in conflict, it is our duty to consider it and determine its effect. If the testimony of Vejil is true as to who fired the first shot, defendant ought not to have been convicted. Vejil claims to have seen the parties at the very moment of the shooting, and swears that Archuletta, and not the defendant, fired the shot. Vejil's testimony on that point is not inconsistent with that of Moore. Moore did not see who fired the shot, but he knows it struck Melenthin, for he saw him stagger. Moore says Vejil ran just before he did. Vejil says Moore ran first. Upon this point Vejil is corroborated, inferentially at least, by the fact that each of them arrived at Lopez's ranch about the same time, and Moore asked Vejil where Melenthin was. If Vejil left the scene of the shooting before Moore, Moore had no reason to ask him for the whereabouts of Melenthin.

The uncontradicted evidence shows that within two or three minutes after the first shots were fired the defendant went from near circle D-4, passed behind Archuletta, who was standing at circle A-2, and went south to where Francisco was hobbling his horse south of the tent. He said to Francisco, "These men have killed each other." He then told Francisco to look after the flock. He then turned and went north to Robinson's camp for help. He told Mrs. Robinson that one of the herders and Mr. Melenthin had shot each other, and that he had come for help. Mrs. Robinson and members of her family went with defendant to the scene of the shooting. Mr. Franklin was there. Defendant assisted Franklin in covering the body of Melenthin with a tarpaulin. Some testimony tending to impeach Moore was

produced by defendant.  The testimony is not only conflict-
ing, but it is not of sufficient importance to justify consid-
eration.

The state contends there is much in the testimony tending
to show a motive on the part of defendant for that which
afterwards occurred.  In view of what we have already said,
it is probably of no consequence whether he had a motive or
not.  In order, however, that every point relied on may be
duly considered and our views thereon faithfully recorded,
we will briefly review the points which are deemed material
It is contended that defendant at all times after July 15,
1918, knew the relationship between him and Archuletta, and
also that Archuletta was a deserter from the United States
army.  Notwithstanding Archuletta swears that such is not
the fact, we are inclined to the belief that the state's con-
tention is well supported by numerous circumstances devel-
oped during the course of the trial.  But his knowledge of
these facts is very far from being evidence of a motive to
take the life of a human being, especially one with whom
his relations had been friendly and intimate up to the very
time of the tragedy.  Even if we go farther and find that
defendant not only had knowledge of the facts above stated
concerning Archuletta, but also had a deep sympathy for
him in his trouble, still we find no evidence of malice or ill
will on the part of defendant towards Mclenthin.  Sympathy
for Archuletta and a disposition to hide him, keep him under
cover, or even to endeavor to screen him from the officers
by deception or disingenuousness, is but the manifestation of
human frailty with which a large percentage of mankind is
more or less afflicted.  We see no significance whatever in the
incident wherein Sheriff Barnes and Melenthin had their
interview with Archuletta and defendant.  The Attorney
General professes to see a feeling of resentment in the de-
fendant when he told the sheriff he could take "his gun also
if he wanted it."  What is there in the incident to justify
the deduction made by the state?  When the sheriff inquired
what defendant had in his wagon, how did defendant know
but that firearms or weapons were the very things which

prompted the inquiry? Indeed, it is difficult to imagine just why the sheriff made the inquiry at all, unless it was for something of that kind. If that be true, then the answer of defendant was perfectly consistent with good feeling and respect. The defendant was a Mexican, and perhaps not the most enlightened as to his legal rights. The defendant had already promised the sheriff and Melenthin that Archuletta was going to work with him in Robinson's employment, thus conveying the idea that if Archuletta was wanted he would be found at defendant's camp. The promise was not violated, nor was the trust betrayed. It is admitted that there was no special significance in the exchange of guns between defendant and Franklin.

The Attorney General says in his brief:

"It is not altogether certain that the purpose of sending for the saddle horse by the defendant Ignacio was done solely at the solicitation of Melenthin and for the purpose of permitting him to take Archuletta to Lasal. On the contrary, there is at least the suspicion that it was done for the purpose of permitting Archuletta to escape."

The only comment we deem it necessary to make as to this contention is that there is not a syllable of testimony in the entire record to justify the suspicion that the horse was sent for for any other purpose than to take Archuletta to Lasal. Robinson testified that on the morning of the twenty-third he met Melenthin and Moore, and, after Melenthin told him where he was going and what he was going for, he told Melenthin he could have a horse, that there were plenty of horses there. Moore testified that Francisco went for a saddle, returned with it, and then went off in another direction. He also testified that defendant told Melenthin he could have the gray horse. Vejil testified to Francisco being sent for a horse. Archuletta testified to it, and every circumstance connected with Francisco on the day of the homicide shows conclusively that at Melenthin's request defendant had first sent Francisco for the saddle and then for the horse.

The state also makes the point that Mrs. Alire said on one occasion defendant told her he liked that man (speaking of Archuletta), that some dog Mexican was trying to betray

him, and that he was going to protect him in every way possible. There is here some indication of feeling towards his own countrymen, but none against Melenthin. His uniform course of conduct towards Melenthin and Melenthin's towards him was that of friendship, confidence, and trust. At defendant's camp on the day of the homicide, while they were waiting for the saddle horse, defendant understood perfectly what Melenthin had come for; he had complied with every request made by Melenthin; they chatted and smoked and apparently were on the best of terms. According to the witness Moore, however, just before the shooting began, and when defendant was resaddling his horse, Melenthin asked, "Ain't you going to let me have that horse?" Defendant answered by saying, "I will let no G—d d—n white man have my horse." If this language was uttered by defendant, it is the first offensive remark heard from his lips. Moore, on cross-examination, admitted that in the preliminary examination he may have testified that defendant said, "I will let no damn man have my horse." He, however, said his statement as made at the trial was correct. Witness Moore admits that up to this time not an offensive word had been uttered, and nothing had been said or done by either party evincing the slightest feeling of hostility. Admitting that the defendant used the language as stated by Moore, at the trial, it had no tendency, in the mind of the writer, to establish a malicious intent to murder a man with whom he had always before been on friendly terms.

Other incidents are relied on by the state. After defendant was arrested he was taken to the home of Mrs. Alire for a change of clothing. Mrs. Alire says that defendant pulled off the shirt he had been wearing, handed it to her, and told her to burn it. She does not say that anything was the matter with the shirt, whether it was bloody, dilapidated, or unfit for further use. The incident, without further explanation, seems to be entirely without point or significance.

Mrs. Alire also testified that on this same occasion she asked defendant what he had done. Defendant replied: "If he (meaning Archuletta) said he done it all him-

self, I am going free again.'' Considering the awkward manner of expressing his meaning, this language may well be construed to mean, "If Archuletta tells the truth and admits he did it all, I am going free again." If a reasonable interpretation can be made suggesting a meaning consistent with innocence, the defendant is entitled to such interpretation.

Mr. Franklin, a witness for the state, says that on the twenty-fourth of August he was up at defendant's camp. There were twenty or twenty-five people around, more or less excited. Defendant was there under arrest. Witness asked defendant, "Ignacio, what have you done; why do they arrest you?" Defendant answered: "Sh-h; they hear." This statement was introduced by the state and relied on as an indication of guilt. It may or may not be. It is only ordinary prudence on the part of any man, whether guilty or innocent, to decline to talk about his case, especially when he is under arrest. If he says nothing, there is no language to be distorted or misconstrued. If he talks, especially in the presence of those who are prejudiced against him, he may, ordinarily, expect his language to be twisted into some sort of an admission. Defendant's precaution in this respect should not be construed as evidence of guilt.

Defendant, during the time Francisco was gone for the saddle, drew a paper from his box, passed it to Melenthin and said: "This war is all damned lies." It was an awkward expression, and his meaning not altogether intelligible. The incident suggests that he was somewhat of a pacifist and not altogether in sympathy with the war. It indicated no malice toward Melenthin, or any living man.

Every incident above set forth and relied on by the state to establish a motive for the killing is suspectible of a construction consistent with the defendant's innocence. Where such is the case, guilt cannot be presumed. This is a fundamental principle of criminal law, and cannot be disregarded without grave injustice to the man charged with crime. Much of the conduct of defendant immediately after the homicide was not only inconsistent with guilt, but strongly

indicative of innocence. Within two or three minutes after the first shots were fired he mounted his horse, rode to where Francisco was, and said to him, "These men have killed each other." He then said to Francisco, "Look after the flock." It is not easy to conceive of a murderer, his hands reeking with the blood of his victim, rushing immediately from the scene of his crime and telling his subordinate to look after a flock of sheep. The mind of such a man would be engrossed with matters of greater moment. The incident savors of innocence rather than guilt. Besides this, the remark, "These men have killed each other," was part of the *res gestœ*, spoken without deliberation or premeditation. It was just as competent as evidence as if some witness on the trial had sworn that he saw Melenthin and Archuletta shooting at one another, and perhaps more satisfactory. The defendant then went on to Robinson's camp for help, procured it, returned, and assisted Franklin in covering the body of Melenthin. These circumstances point strongly to defendant's innocence.

The court is of the opinion that the evidence was insufficient to sustain a conviction.            1

Defendant excepts to the giving of certain instructions, also to certain language used in other instructions, and to the refusal of the trial court to instruct as requested by defendant. We have carefully examined all the alleged errors in these respects, and have carefully read the instructions as a whole. We are of the opinion the rights of the defendant were carefully safeguarded by the instructions, and that in all cases where the refused requests correctly stated the law the matter was sufficiently covered by the instructions given.

Defendant also excepts to a statement made in the argument to the jury by one of the state's counsel who tried the case to the effect that "this man (meaning the defendant) committed one of the gravest crimes ever committed in the state of Utah." This was simply a statement of            2
counsel's opinion made in the course of argument. Counsel had the right to state his conclusions from the evidence even though his conclusions were wrong. There was no error in this regard.

Defendant also excepts to alleged remarks made by the state's attorney to the effect that the defendant had not denied the shooting. The record as to this assignment is insufficient. It is not shown just what the state's attorney said. The exception is not well taken.

Finally, defendant excepts to a certain statement alleged to have been made by the district attorney in his argument to the jury. The record as to that assignment is as follows:

"Mr. King: I except to the statement of counsel that defendant admits himself that he fired the shot. The defendant does not admit it. It is misconduct on the part of the district attorney.

"The Court: Counsel did not say he admitted it.

"Mr. King: If there is any dispute about it, I want the record right at this time as to what counsel did say. Did you (addréssing Mr. Patterson, the district attorney) state the defendant said he fired the shot?

"Mr. Patterson: , That is correct.

"Mr. King: I except to that as misconduct on the part of the district attorney in this case."

From the foregoing record it appears the district attorney did make the statement, and that defendant's attorney made seasonable objection and took an exception thereto.

The writer of this opinion has read with scrupulous care every word of the evidence produced at the trial. He has been unable to find that defendant ever at any time admitted that he fired a single shot in connection with the tragedy. Just why the district attorney made the statement and after his attention was specifically called to it, in effect, reiterated it in the presence of the jury, is incomprehensible. If he conceived the idea that because the defendant did not offer himself as a witness he was deemed to have admitted his guilt, such conception was clearly erroneous. The statutes of this state safeguard a man accused of crime who fails to become a witness in his own behalf against every such presumption. Comp. Laws 1917, section 9279. In the case at bar, because of the peculiar nature of the case, the prosecuting attorney who tried the case ought to have been more than ordinarily careful to see that no injustice was done. The defendant was a Mexican appearing at the trial in the attitude of a man who was related to, and in

sympathy with, a deserter from the United States army. The jury was composed of American citizens having no particular love for Mexicans, and more or less prejudice and race feeling was to be expected. The prejudice would not only exist against the defendant, but against his witnesses, who were of the same race. The district attorney stood before the jury representing the majesty of the law, and no doubt had the implicit confidence of the jury, which was well deserved. The case at best was exceedingly close, and the evidence complicated and difficult to digest. In these circumstances the defendant was at a decided disadvantage. When the district attorney said that the defendant had admitted the shooting, and reiterated the statement in the presence of the jury, they must have thought that by some implication of law an admission by defendant had actually been made. In view of the circumstances, we think the statement was prejudicial error.

For the reasons stated, the judgment is reversed, and the cause is remanded to the district court, with directions to grant the defendant a new trial.

CORFMAN, C. J., and FRICK, WEBER, and GIDEON, JJ., concur.